# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs November 23, 2010

## STATE OF TENNESSEE v. GARY THOMAS REED

### Appeal from the Criminal Court for Cumberland County
### No. 08-0107A    Leon Burns, Judge

### No. E2009-02238-CCA-R3-CD - Filed May 12, 2011

Following a jury trial, the Defendant, Gary Thomas Reed, was convicted of initiating the process of manufacturing methamphetamine, a Class B felony. The Defendant was sentenced as a Range II, multiple offender to 16 years in the Tennessee Department of Correction. In this appeal as of right, the Defendant contends (1) that the evidence was insufficient to sustain his conviction; (2) that the trial court erred in permitting expert testimony; (3) that the trial court erred in permitting lay opinion testimony; (4) that the trial court erred in permitting testimony from a witness who had not been disclosed to defense counsel; (5) that the trial court erred by failing to permit testimony from a potential defense witness; (6) that the trial court erred in denying the motion for new trial; and (7) that the trial court erred in sentencing the Defendant. Following our review, we affirm the conviction and sentence but remand the case for the entry of a corrected judgment consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed; Case Remanded.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which DAVID H. WELLES and NORMA MCGEE OGLE, JJ., joined.

David Neal Brady, District Public Defender and John B. Nisbet, III, Assistant Public Defender (on appeal), and Howard L. Upchurch, Pikeville, Tennessee (at trial), for the appellant, Gary Thomas Reed.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; Randall A. York, District Attorney General; and Amanda M. Hunter, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

Investigator Jeff Slayton of the Cumberland County Sheriff's Department testified that he had participated in approximately 20 methamphetamine laboratory investigations in the past year. As a part of Investigator Slayton's training for his position, he completed a course on clandestine laboratory safety through the Drug Enforcement Administration. In this course, he "learned what components were used to manufacture methamphetamine and how those components combined actually produced meth." He also "learned how to safely investigate clandestine laboratories, how to go in and dismantle one so it could be cleaned up by hazardous material groups."

Investigator Slayton testified that after receiving some indication that a methamphetamine laboratory was present on a property located on Lynch Road, he and his team began surveillance of the property on June 3, 2008. There were "several abandoned trailers" parked on the property that appeared to be uninhabited, but there was also another trailer located on the property that the Defendant appeared to be living in. Jerry King owned the property and the inhabited residence. While there was no electricity supplied by the utility district, there was a generator located at the back of the residence. However, the water from the utility district had been connected using the Defendant's name. Everett Bolin, Jr., of the Crab Orchard Utility District testified that the "meter-reading history report" for the property on Lynch Road reflected that the Defendant requested water for the property in his name on June 5, 2008. The last reading of the meter was made on September 12, 2008.

Investigator Slayton testified that he and other members of his team stayed at the property observing the residence from the woods "in the nighttime hours" until the "early morning hours" as a part of their surveillance. While Investigator Slayton was not physically staying on the property every day, the surveillance team utilized cameras to record the activities on the property. When Investigator Slayton was present, he was able to identify the Defendant and "numerous individuals that were entering and leaving" the residence. However, the Defendant was the person he "viewed most often entering and leaving" the residence. The Defendant spent the night at the residence and was observed "riding a four-wheeler" and "doing something with some equipment outside of the residence" on the property.

On June 25, 2008, a warrant was obtained to search the residence. Based upon the surveillance of the residence, Investigator Slayton believed there would be "anywhere from 12 to possibly 16 people at that residence" when they executed the search warrant. Several hours before they entered the residence, Investigator Slayton observed the Defendant

"continually go to a back bedroom" inside the residence. When they entered the residence, there were 13 people present, including the Defendant and his co-defendant, Jessica Hale.[1]

Sergeant Rick Lanzilotta of the Cumberland County Sheriff's Department testified that he participated in the execution of the search warrant on the property located on Lynch Road on June 25, 2008. When he entered the residence, he proceeded to the back bedroom. As he approached the bedroom, the Defendant slammed the bedroom door in his face. After Sergeant Lanzilotta broke the door down, he arrested the Defendant.

Investigator Casey Cox of the Cumberland County Sheriff's Department testified that he had been involved with 85 to 90 percent of the methamphetamine laboratory investigations in Cumberland County and that all of his training and certifications have enabled him to properly investigate such cases. He stated that a person can manufacture methamphetamine in more than one way but that in Cumberland County, he found that red phosphorus laboratories were more popular. Investigator Cox explained that red phosphorous laboratories manufacture methamphetamine using ephedrine or psuedoephedrine, iodine crystals, and red phosphorous. He stated that the most important ingredient in the process is ephedrine or psuedoephedrine because it is the only ingredient in the manufacturing process that must be present.

As relevant to this case, Investigator Cox stated that in order to use the most important ingredient, psuedoephedrine, the manufacturer must break the "binder away from the pill." The binder can be removed by mixing the tablet with Heet, which will dilute the pill, forming what is commonly called an ephedrine wash. The ephedrine wash is then poured through a filtering system, which separates the binder from the liquified ephedrine. Generally, manufacturers use coffee filters to separate the binder. The resulting liquid can be stored in any type of container, such as a Mason jar.

Investigator Cox explained that the three ingredients, ephedrine, iodine crystals, and red phosphorous, are then "combined together and heated," creating a methamphetamine base. The methamphetamine base can be mixed with a solvent, such as camp fuel and then filtered to remove the methamphetamine crystals, the final product. Manufacturers may also create a gas using a homemade generating system and muriatic acid that will heat the base, causing the methamphetamine crystals to form. The base is then filtered, removing the crystals. The crystals can be whitened with acetone, which makes the crystals appear to have a higher concentration. The crystals are generally weighed and placed into small bags for selling purposes.

_____

[1] She pled guilty to attempt to manufacture methamphetamine and received a six-year sentence, suspended to probation.

Investigator Cox participated in the investigation of the Defendant's case and collected the evidence found in the back bedroom of the residence. He found a black bag with pink lining on the bed. The bag contained a digital scale, a turkey baster, rubber gloves, a small container, a rubber stopper with green duct tape on top with a small hole in the top, rubber tubing, clear plastic tubing, pH strips, Mason jar lids, a bottle of Visine that contained muriatic acid, and a small glass pipe. In the plastic container with the pink lid, he found red phosphorous. He found coffee filters that appeared to be "damp" around the edges and a clear plastic bag that contained left-over red phosphorous.

Underneath the dresser in the bedroom, Investigator Cox found several four-quart Mason jars. The jars contained an ephedrine wash. One of the jars was a "pinkish-red color." He explained that the substance was a different color because the manufacturer had probably used a Sudafed pill, which contained a dye, to create the wash. He admitted that he was unable to conclusively determine when the ephedrine wash was created or how long the jars had been in the bedroom. He stated that the items found in the room were commonly used in the manufacturing process of methamphetamine and that the "only legitimate purpose" for the presence of the items was to manufacture methamphetamine.

Also inside the bedroom, he found a leaf blower, three or four chainsaws, a "toy bulldog" attached to the mirror, mail addressed to the Defendant, and a binder that contained paperwork and documents bearing the Defendant's name. He stated that the Defendant was commonly referred to as "Bulldog."

Janice Hall testified for the Defendant and stated that she worked for the Defendant, who owned his own landscaping business. She stated that the Defendant lived on Moonlight Trail and that the property on Lynch Road was used to store his business equipment. Ms. Hall testified that she sold a black bag with pink lining to the co-defendant at a yard sale. Ms. Hall stated that she saw the co-defendant with the bag approximately two weeks before the Defendant was arrested. On cross-examination, she admitted that she had a child with the Defendant's brother.

Natasha Bowman testified that she also worked for the Defendant and that the Defendant was living on Moonlight Trail at the time of his arrest. She admitted that he stored his work equipment on the property on Lynch Road. She stated that everyone who worked for the Defendant met at the property on Lynch Road at the beginning of the day. She stated that on June 25, 2008, she had worked with the Defendant in Fairfield Glade before bringing the equipment back to the property on Lynch Road. She testified that Ms. Hall was her friend and that Ms. Hall sold her bag to the co-defendant, who was at the property on Lynch Road when they returned the equipment on June 25, 2008.

ANALYSIS

I. Sufficiency

The Defendant contends that the evidence was insufficient to sustain his conviction when, other than his presence in the room, there was no evidence that the Defendant initiated the process of manufacturing methamphetamine. The Defendant asserts that the bag found in the bedroom belonged to the co-defendant, who was also found at the residence when the search warrant was executed, and that mail belonging to the Defendant indicated that he lived in another location. The State responds that the jury "reasonably inferred the defendant's knowing involvement in the manufacturing process that took place in the bedroom." The State asserts that the evidence presented at trial reflected that the Defendant "had an ongoing possessory interest in the trailer" and that the Defendant "used the rear bedroom often enough for a jury to infer that he was the individual who initiated the chemical process intended to result in methamphetamine."

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). "A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

The Defendant was convicted of initiating the process of manufacturing methamphetamine in violation Tennessee Code Annotated section 39-17-435. The statute states, in pertinent part:

(a) It is an offense for a person to knowingly initiate a process intended to result in the manufacture of any amount of methamphetamine.

(b) It shall not be a defense to a violation of this section that the chemical reaction is not complete, that no methamphetamine was actually created, or that the process would not actually create methamphetamine if completed.

(c) For purposes of this section, "initiates" means to begin the extraction of an immediate methamphetamine precursor from a commercial product, to begin the active modification of a commercial product for use in methamphetamine creation, or to heat or combine any substance or substances that can be used in methamphetamine creation.

(d) Expert testimony of a qualified law enforcement officer shall be admissible for the proposition that a particular process can be used to manufacture methamphetamine. For purposes of this testimony, a rebuttable presumption is created that any commercially sold product contains or contained the product that it is represented to contain on its packaging or labels.

Tenn. Code Ann. § 39-17-435(a)-(d).

In the light most favorable to the State, the evidence established that the Defendant was responsible for providing water to the residence, that the Defendant used the residence as a meeting place for his business and to store his business equipment, that the Defendant stayed overnight at the residence on numerous occasions, that mail addressed to the Defendant was kept at the residence, that the Defendant frequently went into the bedroom where the materials were found, and that the Defendant attempted to hide in the bedroom when officers executed the search warrant. The testimony presented at trial also established that the Defendant's nickname was Bulldog and that a stuffed bulldog was attached to a dresser in the bedroom. In addition to the materials found in the bag on the bed, inside the bedroom underneath the dresser, officers found four Mason jars containing what appeared to be an ephedrine wash – a process whereby pseudoephedrine, a commercial product, is broken down to extract a necessary component of methamphetamine. Accordingly, we conclude that the evidence was sufficient to establish that the Defendant initiated the process of manufacturing methamphetamine when he began the "extraction of an immediate methamphetamine precursor from a commercial product."

## II. Expert witness

The Defendant contends that the trial court erroneously permitted Investigator Cox to testify as an expert regarding the processes used to manufacture methamphetamine when the evidence established that Investigator Cox was only an expert in dismantling methamphetamine laboratories, not an expert in the processes used to manufacture

methamphetamine. The Defendant further contends that the statute authorizing officers to testify as experts on this subject "guts the evidentiary rules concerning the admission of real expert testimony" and violates his Sixth Amendment right to confrontation. The State responds that the Defendant has waived this issue because he failed to object when Investigator Cox was tendered as an expert witness. The State alternatively contends that the trial court properly permitted expert testimony from Investigator Cox, who had a "lengthy and complete history of training and education regarding the production of methamphetamine."

The record reflects that the Defendant failed to object when Investigator Cox was tendered as an expert witness. Additionally, the Defendant failed to object to the substance of Investigator Cox's testimony regarding the production of methamphetamine. We agree with the State that the Defendant's failure to raise a contemporaneous objection to the tendering of Investigator Cox as an expert witness waives our consideration of the issue on appeal. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). The Defendant does not request plain error review of this issue, and we do not discern a basis for plain error review given the facts of this case. See Tenn. R. App. P. 36(b).

### III. Lay opinion testimony

The Defendant contends that the trial court erroneously permitted lay opinion testimony from Officer Slatton. The Defendant asserts that Officer Slatton testified that the Defendant was living in the trailer and that the water had been connected using the Defendant's name when he did not have any personal knowledge of these facts. The State responds that the Defendant has waived this issue for failure to cite any authority in support of his assertion and for failure to object at trial on the grounds asserted on appeal. The State alternatively responds that Officer Slayton had personal knowledge of the Defendant's living arrangements because he observed the Defendant for countless hours and noted the Defendant's "constant comings and goings" at the Lynch Road address before executing the search warrant.

Contrary to the State's assertion, the Defendant cited Rules 602 and 701 of the Tennessee Rules of Evidence as authority in support of his contention. However, defense counsel did not object to the statement that the Defendant's name was used to connect the water from the utility district. We believe that defense counsel objected at trial on the basis of improper lay opinion testimony regarding the statement that the Defendant was living in the trailer. Regardless of any waiver for failure to object, the Defendant is not entitled to relief on either ground.

If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are

(1) rationally based on the perception of the witness and
(2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

Tenn. R. Evid. 701(a)(1)-(2). "Because it is the jury's duty to draw conclusions from the evidence presented, a 'non-expert witness must ordinarily confine his testimony to a narration of facts based on first-hand knowledge and avoid stating mere personal opinions.'" State v. Justin Bradley Haynie, No. W2006-01840-CCA-R3-CD, 2007 WL 4335481, at *18 (Tenn. Crim. App. Dec. 7, 2007), perm. app. denied (Tenn. May 5, 2008) (quoting State v. Middlebrooks, 840 S.W.2d 317, 330 (Tenn. 1992)). "[T]he admission of lay opinion testimony is limited to those situations wherein the jury could not readily draw its own conclusions on the ultimate issue, without the aid of the witness's opinion testimony." State v. McCloud, 310 S.W.3d 851, 865 (Tenn. Crim. App. 2009). Questions regarding the admission of lay opinion testimony are reviewed using an abuse of discretion standard. Id. (citing State v. Gray, 960 S.W.2d 598, 606 (Tenn. Crim. App. 1997)).

At trial, Officer Slayton testified on direct examination that the Defendant was living in the trailer. Officer Slayton also testified on cross-examination that the Defendant's name was used to connect the water to the trailer from the utility district. The testimony relative to the water connection was not based on the witness's lay opinion as the witness had investigated the case and discovered this fact at some point. However, the testimony relative to the Defendant's living arrangement was a conclusion based upon the witness's own observations. This conclusion was not helpful to a clear understanding of the issue of the control of the premises or the contents within the premises when the jury could "readily draw its own conclusions on [this] issue, without the aid of the witness's opinion testimony." Id. at 865. Thus, the testimony was improper and should have been excluded when defense counsel objected to the statement. However, the error in its admission was harmless because this conclusion was "so readily apparent from the evidence." See id. (concluding that an officer's testimony that the defendant was driving a vehicle was harmless when there was other direct evidence that established this point at issue in the trial); see also Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.").

IV. Surprise witness

The Defendant contends that the trial court erroneously permitted testimony and documentation from a witness, Mr. Everett Bolin, Jr. from the Crab Orchard Utility District, whose name was not listed on the indictment and had not been disclosed by the Assistant District Attorney General prior to trial. The Defendant further contends that he was denied a fair trial as a result of the trial court's error because he was prejudiced by the lack of notice of the permitted testimony and documentation as this was the only evidence that he had any connection to the trailer where the materials were found. The State responds that the Defendant has failed to show that the trial court abused its discretion in permitting the testimony and the document and that the Defendant has failed to show how he was prejudiced by the lack of notice.

At trial, defense counsel cross-examined Officer Slayton as to whether he had any proof that the Defendant had used his name to connect the water from the utility district to the trailer. Defense counsel asked Officer Slayton if he had any bills from the utility district that reflected that the Defendant was the one person who had the water connected. Defense counsel also asked Officer Slayton if he was aware if any witnesses from the utility district were going to testify. Officer Slayton responded that he did not bring any documentation with him to support his assertion and that he did not know if any witnesses were going to testify regarding this issue. After the lunch recess, a jury-out hearing was held in which the Assistant District Attorney General announced that Mr. Bolin from the Crab Orchard Utility District was present to testify. This hearing was not transcribed. Before Mr. Bolin testified, defense counsel renewed his objection and requested another hearing for the record. At the close of the State's case, another hearing was held on this issue.

At the jury-out hearing, defense counsel argued that the Defendant was prejudiced by Mr. Bolin's testimony because he was not given notice of the witness prior to trial. Defense counsel stated that his defense theory was based on the premise that the State was not calling any witnesses who could attest that the Defendant had any connections to the trailer. The Assistant District Attorney General responded that defense counsel opened the door to this type of testimony when he vigorously cross-examined Officer Slayton on the issue of the utilities. The trial court denied defense counsel's motion to strike the testimony and stated,

> Well, as I indicated before we came back after the break at lunch, that I would be allowing Mr. Bolin to testify, and in light of the fact that the issue was raised by the [D]efendant in questioning about someone being here from the water department. And I don't see the prejudice there that would have hindered the preparation for the defense.

We acknowledge that the district attorney general is required to "endorse on each indictment or presentment . . . the names of the witnesses as the district attorney general

intends shall be summoned in the cause." Tenn. Code Ann. § 40-17-106. This provision is "directory only, and a witness is not disqualified to testify because his name does not appear on the indictment." State v. Gilbert, 612 S.W.2d 188, 191 (Tenn. Crim. App. 1980) (citing Aldridge v. State, 470 S.W.2d 42, 45 (Tenn. Crim. App. 1971); Houston v. State, 567 S.W.2d 485, 487 (Tenn. Crim. App.1978)). If a witness was not listed on the indictment or disclosed prior to trial, the decision "[w]hether to allow the witnesses to testify is a matter of discretion for the trial judge," who should consider the "circumstances in the particular case" in determining whether to permit the testimony. State v. Underwood, 669 S.W.2d 700, 703 (Tenn. Crim. App. 1984) (citing McBee v. State, 372 S.W.2d 173 (Tenn. 1963)). Likewise, the admissibility of rebuttal evidence is a matter of discretion for the trial court. State v. Thompson, 43 S.W.3d 516, 524 (Tenn. Crim. App. 2000).

In this case, the witness was offered as a rebuttal witness when defense counsel vigorously cross-examined Officer Slayton as to his lack of proof for his assertion that the Defendant had connected the water to the trailer using his name. Defense counsel's cross-examination established the relevancy and necessity for this witness. See State v. Kilpatrick, 52 S.W.3d 81, 87-88 (Tenn. Crim. App. 2001) (concluding, on a similar issue, that when a defendant challenges the chain of custody in a case, the defendant should have known that "a litany of witnesses, who otherwise know little about the case will testify for the State"); see also State v. Alfred Eugene Bradley, No. E2002-02840-CCA-R3-CD, 2004 WL 223399, *at 11 (Tenn. Crim. App. Feb. 5, 2004), perm. app. denied (Tenn. Sep. 7, 2004) (concluding that the defendant failed to establish that he was prejudiced by the State's decision to call a rebuttal witness in their case-in-chief). Accordingly, we conclude that the trial court did not err in permitting testimony from this witness.

## V. Testimony from co-defendant

The Defendant contends that the trial court erred in prohibiting testimony concerning the fact that the co-defendant pled guilty to the offense and that the Defendant's right to present a defense was hindered by the trial court's ruling. The State responds that the Defendant waived this issue when defense counsel failed to seek a formal ruling on the record as instructed by the trial court. The State further responds that the trial court did not err in "informally" ruling that evidence or testimony relative to the co-defendant's guilty plea was inadmissible unless the evidence was presented through the co-defendant or "through some non-hearsay evidence."

The record is devoid of any reference to a hearing regarding this matter. However, on appeal to this court, the record was supplemented with affidavits filed by the trial court, the Assistant District Attorney, and defense counsel regarding an untranscribed, pre-trial

discussion in which the State's motion to prohibit any mention of the co-defendant's plea agreement was discussed.

In its order and statement of evidence, the trial court stated that it advised defense counsel that if this issue were to be brought up at trial, defense counsel would have to prove that the evidence was relevant and did not violate the rules of hearsay before he would be permitted to reference the co-defendant's plea agreement. The trial court stated that this was not a formal ruling and that it assumed a "request would be made for a hearing or a ruling on the record." In the State's affidavit, the Assistant District Attorney General stated that outside of the informal discussion in which the trial court advised defense counsel that he had to properly introduce the evidence, defense counsel never requested a jury-out hearing or attempted to elicit this information at trial. In defense counsel's affidavit, defense counsel stated that during the informal discussion, the trial court ruled that evidence of the co-defendant's plea agreement was irrelevant and inadmissible. Defense counsel further stated that the trial court advised counsel that a formal announcement regarding this ruling would be made on the record "during the trial or at some point during necessary 'jury-out' proceedings conducted in the trial." Defense counsel stated that the trial court's ruling was never placed on the record.

According to the affidavits, defense counsel was advised that he would have to establish that the evidence was relevant and admissible before evidence concerning the co-defendant's plea agreement would be admitted. This ruling was proper. Tenn. R. Evid. 402, 403; see also State v. Powers, 101 S.W.3d 383, 394-95 (Tenn. 2003) (stating that the rules of evidence govern admissibility of evidence implicating someone other than the defendant). Defense counsel never attempted to elicit the information at trial and never sought a definitive ruling on the record as instructed by the trial court. Accordingly, we conclude that this issue is waived. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

VI. Newly discovered evidence

The Defendant contends that the trial court erred in overruling his motion for new trial based upon the newly discovered evidence of the co-defendant's testimony that she was the one who initiated the process of manufacturing methamphetamine in the trailer, not the Defendant. The Defendant further contends that the trial court used the wrong standard in considering the issue as evidenced by the trial court's statement that because it did not believe the co-defendant's statement, it did not believe that the evidence was sufficient to grant a new trial. The State responds that the evidence was not newly discovered because the witness had refused to testify at trial, declaring that she would invoke her right against

-11-

self-incrimination if she were subpoenaed. The State further responds that the evidence was not material and would not have changed the outcome of the trial.

At the motion for new trial hearing, defense counsel introduced an affidavit from the co-defendant in which she stated

> [t]hat a search warrant was executed at this [Crossville residence] on or about June 25, 2008. Various items, products, instruments and other personal properties were found in and about the mobile home which law enforcement officers contended were used in the manufacture of methamphetamine[]. All of these items were mine and all activities conducted in and about the mobile home associated with methamphetamine[] were initiated or engaged in by me and me alone. The said [Defendant] did not participate in, consent to, assist or participate in these activities[.]

The co-defendant further stated that she was contacted by defense counsel prior to trial and that she advised defense counsel that if called as a witness, she would "assert [her] Fifth Amendment privilege or otherwise refuse to provide any testimony favorable to [the Defendant]" because she "had matters which were either pending or unresolved or which [she] otherwise believed could adversely impact [her] in future proceedings or matters pertaining to [her] future incarceration or anticipated release from jail."

Defense counsel contended that he used "reasonable diligence to acquire th[e] evidence"; that the affidavit was material; and that the affidavit was "likely to change the result if accepted by the jury." Defense counsel further contended that the co-defendant was an unavailable witness because she intended to assert her right against self-incrimination if called as a witness at trial. The State responded that the co-defendant's affidavit was not newly discovered because she was available to testify at trial. The State asserted that the co-defendant pled guilty on February 14, 2009, two months prior to the Defendant's trial that was held on April 19, 2009. The State also introduced three statements from officers who investigated the case. These statements reflected that the co-defendant denied any involvement in the production of methamphetamine on at least two separate occasions.

Following the hearing, the trial court stated that "the fact that an affidavit has been filed does not necessarily mean that the [c]ourt would have to accept it as true" and that it did not "have much reason to believe [the co-defendant's] affidavit" given her inconsistent statements. The trial court further stated that it was "difficult to say that [her testimony] would have changed the result of the trial" when she would have been cross-examined on her prior convictions and drug-related charges. The trial court ultimately found that the alleged newly discovered evidence was not "sufficient to grant a new trial."

"The decision to grant or deny a new trial on the basis of newly discovered evidence is a matter which rests in the sound discretion of the trial court." State v. Goswick, 656 S.W.2d 355, 358 (Tenn. 1983) (citing Jones v. State, 519 S.W.2d 398, 400 (Tenn. Crim. App. 1974)). "To obtain a new trial on the basis of newly discovered evidence, the defendant must establish (1) reasonable diligence in seeking the newly discovered evidence; (2) materiality of the evidence; and (3) that the evidence will likely change the result of the trial." State v. Nichols, 877 S.W.2d 722, 737 (Tenn. 1994) (citing Goswick, 656 S.W.2d at 358-60). "An assessment of the witnesses' credibility by the trial court is essential in order for the trial court to determine whether the evidence is likely to change the result of the trial." State v. Bowers, 77 S.W.3d 776, 784 (Tenn. Crim. App. 2001); see also State v. Vasquez, 221 S.W.3d 514, 527 (Tenn. 2007) (stating that in coram nobis proceedings, the trial court must be "reasonably well satisfied" with the veracity of the newly discovered evidence). When considering questions of credibility, the trial court should deny the motion for new trial "'if the [c]ourt concludes that the evidence would not be worthy of belief by the jury.'" Bowers, 77 S.W.3d at 784 (quoting State v. Marlon D. Beauregard, No. W1999-01496-CCA-R3-CD, 2000 WL 705978, at *4 (Tenn. Crim. App. May 26, 2000), perm. app. denied (March 5, 2001)).

Here, defense counsel introduced an affidavit from the co-defendant, who did not testify at the motion for new trial hearing. However, affidavits from officers involved in the investigation were also introduced into evidence; these affidavits belied the co-defendant's current testimony contained in the affidavit. We agree with the trial court's assessment regarding the credibility of the co-defendant. Her inconsistent statements lead us to conclude that the testimony contained in the affidavit likely would not have changed the outcome of the trial. Following our review, we conclude that the trial court used the correct standard in determining this issue and did not abuse its discretion in denying the motion for new trial based upon the allegation of newly discovered evidence.

## VII. Sentencing

The Defendant contends that the trial court's decision to enhance his sentence was contrary to the Supreme Court's decision in Blakely v. Washington, 542 U.S. 296 (2004) and that the ultimate sentence imposed was an excessive sentence that was inconsistent with the purposes and principles of the sentencing act. The State responds that the record supports the trial court's sentencing decision given the Defendant's criminal history and failure to appear for the verdict in the instant case. The State further responds that the Defendant's reliance on Blakely is misplaced because the Defendant was properly sentenced in accordance with the 2005 amendment to the Sentencing Act.

At the sentencing hearing, the State introduced certified copies of the Defendant's prior convictions. The records reflect that the Defendant was convicted of attempted aggravated assault, a Class D felony, on June 25, 1996; two counts of attempt to manufacture methamphetamine, a Class D felony, on July 23, 2002; and vehicular assault, a Class D felony, on March 15, 2005. Danny Williams of the Tennessee Board of Probation and Parole testified that the Defendant also had several misdemeanor convictions for driving under the influence, driving while his license was suspended, and speeding.

Investigator Cox testified that the Defendant, who was on bond at the time of trial, was not present when the jury returned their verdict against the Defendant on March 19, 2009. Investigator Cox testified that the Defendant could not be found and was not apprehended until April 1, 2009. As a result of the Defendant's absence, the Defendant was charged with felony failure to appear.

The Defendant's brother, Dale Reed, testified that the Defendant had two children and had been living with his ex-wife and children prior to his incarceration. Mr. Reed testified that the Defendant cared for and provided for his children.

Following the sentencing hearing, the trial court considered the four certified judgments of conviction reflecting that the Defendant had been convicted of four Class D felonies and found that the Defendant was a Range II, multiple offender. In determining the Defendant's sentence as a multiple offender, the trial court applied enhancement factor (1),

> The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range.

Tenn. Code Ann. § 40-35-114(1). The trial court considered but rejected enhancement factor (8),

> The defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community.

Tenn. Code Ann. § 40-35-114(8). In accordance with the "catch-all" mitigating factor, the trial court applied but gave little weight to the fact that the Defendant had a good working history and cared for his family. Tenn. Code Ann. § 40-35-113(13). The trial court considered but rejected all other mitigating factors. In sentencing the Defendant, the trial court stated, "I do not believe that the proof would justify a 20-year sentence, but I think the factors are sufficient to justify a 16-year sentence."

-14-

An appellate court's review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d) (2005). The appealing party has the burden of showing that the imposed sentence is improper. Id. If review of the record reflects that the trial court properly considered all relevant factors, gave due consideration to each factor, and its findings of fact are adequately supported by the record, this court must affirm the sentence. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). Should the record fail to demonstrate the required considerations by the trial court, then appellate review of the sentence is purely de novo. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review, the trial court must "place on the record, either orally or in writing, what enhancement and mitigating factors were considered, if any, as well as the reasons for the sentence." Tenn. Code Ann. § 40-35-210(e).

The Defendant committed this offense on or about June 25, 2008; thus, he was sentenced under the revised Sentencing Act as enacted by the Tennessee General Assembly in 2005. The Act provides that:

> (c) The court shall impose a sentence within the range of punishment, determined by whether the defendant is a mitigated, standard, persistent, career, or repeat violent offender. In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:
>
> > (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
> >
> > (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c)(1)-(2) (2006).

The weight to be afforded an enhancement or mitigating factor is left to the trial court's discretion so long as its use complies with the purposes and principles of the 1989

Sentencing Act and the court's findings are adequately supported by the record. Tenn. Code Ann. § 40-35-210(d)-(f); State v. Carter, 254 S.W.3d 335, 342-43 (Tenn. 2008). "An appellate court is therefore bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in . . . the Sentencing Act." Carter, 254 S.W.3d at 346. Accordingly, on appeal we may only review whether the enhancement and mitigating factors were supported by the record and their application was not otherwise barred by statute. See id.

In conducting its de novo review with a presumption of correctness, the appellate court must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, (7) the potential for rehabilitation or treatment, and (8) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee. Tenn. Code Ann. §§ 40-35-102, -103, -210 (2006); see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236-37 (Tenn. 1986).

Because the offense was committed after the 2005 amendment to the Sentencing Act, the Defendant's allegation that the trial court's imposition of sentence violated Blakely is without merit. Furthermore, the record reflects that the trial court followed the applicable sentencing principles and appropriately found the existence of an applicable enhancement factor. The record shows that the trial court gave proper consideration, but little or no weight, to any proposed mitigating factors. Under the revised Sentencing Act, this court may not re-weigh the enhancing and mitigating factors provided the trial court followed the principles of sentencing. Given that the enhancement factor was supported by the record and that the trial court considered the mitigating factors as required, we conclude that the record supports the trial court's sentencing decision. Accordingly, we affirm the Defendant's 16-year sentence for initiating the process of manufacturing methamphetamine.

## CONCLUSION

In consideration of the foregoing and the record as a whole, the conviction and sentence are affirmed. However, the judgment was signed by Judge Patterson, who did not preside over the trial. It is apparent from the record that Judge Burns presided over the entirety of the Defendant's case. Therefore, the judgment should be corrected to reflect this fact.

_____
D. KELLY THOMAS, JR., JUDGE

-16-